The STATE of Ohio, Appellee,

v.

SCHEIDEL, Appellant.

[Cite as *State v. Scheidel,* 165 Ohio App.3d 131, 2006-Ohio-195.]

Court of Appeals of Ohio,
Eleventh District, Ashtabula County.

No. 2003–A–0087.

Decided Jan. 20, 2006.

132

Thomas L. Sartini, Ashtabula County Prosecuting Attorney, and Angela M. Scott, Assistant Prosecuting Attorney, for appellee.

Leo J. Talikka, for appellant.

WILLIAM M. O'NEILL, Judge.

{¶ 1} Appellant, Steven H. Scheidel, appeals from his conviction on two counts of rape, one count of attempted rape, and two counts of kidnapping. Upon review, we reverse the judgment of the trial court and remand the matter for a new trial.

{¶ 2} Scheidel was indicted on five counts: two counts of rape, both felonies of the first degree, in violation of R.C. 2907.02; one count of attempted rape, a felony of the second degree, in violation of R.C. 2907.02 and 2923.02; and two counts of kidnapping, both felonies of the first degree, in violation of R.C. 2905.01.

{¶ 3} The charges arose from an investigation by the Ashtabula County Department of Jobs and Family Services. Scheidel had allegedly molested his stepdaughter, M.M., on two separate occasions. She was eight and nine years old, respectively, during the incidents in question. The first incident occurred in October 2001, and the second incident occurred in November 2001. The indictment contained a specification relating to the victim's age because she was younger than 13 years of age at the time of the incidents. One who "purposely compels the victim to submit by force or threat of force" under such circumstance will receive a sentence of life in prison.[1]

{¶ 4} Scheidel was convicted by a jury on all five counts and received the following sentence on June 5, 2003: two life terms in prison for the two rape charges, eight years in prison for the attempted rape charge, and ten years in prison for each of the kidnapping charges, all sentences to be served concurrently. It is from this judgment that Scheidel timely filed his notice of appeal to this court.

---

1. R.C. 2907.02(B).

{¶ 5} All of Scheidel's three assignments of error relate to alleged misconduct by the prosecutor, which he claims prevented him from having a fair trial.

{¶ 6} His first assignment of error is as follows:

{¶ 7} "Steven Scheidel was deprived of his due process right to a fair trial by the Prosecutor's failure to provide defense counsel evidence of prior inconsistent statements made by the alleged victim prior to being interviewed by children's services, evidence that was exculpatory and material to guilt or punishment."

{¶ 8} The disclosure of exculpatory evidence is controlled by the case of *Brady v. Maryland*.[2] In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[3] A *Brady* violation occurs when the following three components are present: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[4] Further, the trial court must determine whether the favorable evidence was improperly suppressed, meaning that the evidence was material and likely to produce a different result: "[i]n determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[5]

{¶ 9} The fact of the allegedly improper suppression of evidence did not come to light until Scheidel's attorney was reviewing the presentence investigation report ("PSI") eight days after he had filed a notice of appeal to this court. In the PSI, which the trial court ordered to be made part of the record herein (but kept under seal), there was a reference to a certain interview between M.M. and Deputy Lazanis of the Ashtabula County Sheriff's Department on February 2, 2002. During that interview, M.M. told Deputy Lazanis that Scheidel "did not put anything in her," meaning that he did not penetrate her vagina. The deputy's notes in the PSI stated that, based on his interview with M.M., no penetration of M.M. appeared to have occurred. An additional item of evidence that Scheidel argues should have been disclosed to him consisted of a statement

---

2. *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

3. Id. at 87, 83 S.Ct. 1194, 10.L.Ed.2d 215.

4. *Strickler v. Greene* (1999), 527 U.S. 263, 281–282, 119 S.Ct. 1936, 144 L.Ed.2d 286.

5. *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus.

by M.M. to the deputy that Scheidel had taken off his shirt during one of the incidents, evidence inconsistent with a statement to a social worker three days later that Scheidel had had his shirt on during the incident. Scheidel argues that these statements by M.M. are exculpatory evidence that should have been turned over to him prior to trial and that he could have used these inconsistent statements to impeach both M.M. and another witness at trial.

{¶ 10} The state of Ohio counters by arguing that the record does not reflect exactly what discovery materials were provided during discovery; that, in general, police reports and witness statements are not discoverable, unless they are exculpatory; and that the materials in question are merely notes recorded by the deputy sheriff, which do not become a statement of a witness until and unless approved by the witness. Thus, argues the state of Ohio, the deputy's notes are not the "statement" of M.M., and while they could have been used to impeach the deputy, he was not called as a witness. Support for the state's position is found in Evid.R. 613, dealing with impeachment of a witness with a prior inconsistent statement and *State v. Linder*:

{¶ 11} "Although the term 'statement' is not defined in Evid.R. 613, for purposes of criminal law generally and Crim.R. 16 specifically, it includes: (a) a written statement actually signed, or otherwise adopted or approved, by a witness or party; (b) a mechanical recording of the witness's words or transcription thereof; or (c) a substantially verbatim recital of such statement in a continuous narrative form. * * * We see no reason to use a different definition of the term when it is used in Evid.R. 613. A summary of a witness's oral conversation becomes a witness's statement only if she has reviewed and signed, or otherwise adopted it, or if it is a nearly verbatim account as opposed to being merely the investigator's own selections, interpretations, or interpolations." [6]

{¶ 12} Thus, there appears to be a basis for saying that Deputy Lazanis's notes do not constitute the statement of M.M. unless and until they are approved by her. The court in *Linder* expanded on this notion:

{¶ 13} "Appellant failed to show that the summary was anything more than Officer Love's characterization of Harness's prior oral statements. There was no indication that the summary was reviewed, signed or otherwise adopted by Harness as her own. Neither was the summary demonstrated to be a verbatim recital of Harness's narrative. * * * Therefore, the trial court did not err in preventing counsel from impeaching Harness with the summary because it was not a prior inconsistent statement of Harness for purposes of Evid.R. 613." [7]

---

6. *State v. Linder,* 10th Dist. No. 01AP–962, 2002-Ohio-5077, 2002 WL 31123855, at ¶ 9, citing *State v. Moore* (1991), 74 Ohio App.3d 334, 340–341, 598 N.E.2d 1224.

7. (Citations omitted.) Id. at ¶ 11.

{¶ 14} If, then, the "statement" of M.M. to Deputy Lazanis was not her statement after all and, therefore, could not have been her prior inconsistent statement, then there was no *Brady* violation, because there was nothing exculpatory for the prosecution to suppress. The subject matter of the so-called exculpatory evidence was merely the handwritten notes of the deputy investigator. The notes do not purport to be a verbatim transcription, and there is nothing in the record to indicate that they were approved by M.M.

{¶ 15} We believe, however, that there is an important distinction to be made between *Linder* and the instant case, and that distinction has to do with the age of M.M. M.M. was nine years old when she was interviewed by Deputy Lazanis. Nine-year-olds are not in the business of reviewing, adopting, or approving witness statements. Nothing in the record indicates whether Deputy Lazanis asked M.M. for her approval of her statement following the interview, but, in the absence of a separate adjudication in probate court to determine her ability to approve such a statement, we can only speculate as to whether she would have approved her statement to the deputy. If the existence of her statement had been disclosed prior to trial, it would have been a simple matter for the trial court to conduct an in camera interview of M.M. to determine whether she had made such a statement and whether she approved it. Had such an in camera interview taken place and had M.M. approved her statement before the trial court, then counsel for Scheidel would have been able to impeach her with regard to her prior inconsistent statement. For this reason, we believe that a *Brady* violation did take place, because the statement of M.M. was not disclosed by the prosecution, it was favorable to the defendant, and it was material because there is a reasonable probability that it would have produced a different outcome. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[8]

{¶ 16} The state of Ohio argues that any inconsistency between the deputy's notes from his interview with M.M. and her trial testimony would have been understandable in the eyes of the jury and easily explained away on redirect. After all, she also had told the deputy that she was afraid of Scheidel, that she was intimidated by the male deputy in the threatening environment of a police station, that she was confused during the interview with the deputy, and that she did much better when asked leading questions by the female social worker. However, we look upon the subject matter of M.M.'s statement to the deputy to be just the kind of exculpatory evidence that creates a reasonable doubt as to the guilt of the accused: "suppression by the prosecutor of certain exculpatory evidence violates due process only where that evidence creates a

---

8. *Strickland v. Washington* (1984), 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

reasonable doubt as to the *guilt* of the accused."[9]  M.M.'s statement to the deputy amounts to a prior inconsistent statement and could have been used to impeach her testimony in accordance with Evid.R. 613 had it been disclosed to defense counsel.  This kind of evidence clearly falls within the *Brady* rule.[10]

{¶ 17} Scheidel's first assignment of error has merit.

{¶ 18} The second assignment of error is as follows:

{¶ 19} "The trial court erred, to the prejudice of Mr. Scheidel, in permitting the prosecution to present four (4) photographs into evidence that were not previously disclosed to defense counsel in discovery."

{¶ 20} The state presented the testimony of Nurse Gorsuch, who had conducted a sexual-abuse examination of M.M. on March 5, 2002.  Gorsuch had conducted the examinations as part of her employment with Tod Children's Hospital at the Tri–County Advocacy Center.  During her testimony, she referred to a Tri–County Advocacy Center report and to four photographs taken by her of M.M.'s genital area on March 5, 2002.  She testified that two of the four photographs showed signs of sexual abuse.  Defense counsel objected to the introduction of the photographs on the ground that they had not been provided to him during discovery.  When the issue was raised with the trial court prior to Nurse Gorsuch's testimony, the state of Ohio responded:

{¶ 21} "Ms. Tarighati: Your Honor, we have four photographs that we intend to introduce into evidence.  We provided that information to the defendant in discovery and we allowed, upon motion of the defendant, the Court shall order the attorney to permit the defendant to inspect and copy.  There was never a request made to copy.

{¶ 22} "If defense counsel had—we showed him the photographs yesterday morning.  I mean, I don't know that we're required to do anything more than that.  He never offered to pay for the costs of copying or anything like that and hasn't made a big deal about it until this morning or until this morning.  We did show him the photographs yesterday.  He has not indicated he has an expert who is going to testify that the photographs don't show what our witness is going to say that they show."

{¶ 23} Following this colloquy, the trial court quoted Crim.R. 16(B)(1)(c) as follows:  " 'Documents and Tangible Objects.'  It does say, 'Upon motion, the Court shall order the prosecuting attorney to permit the defendant to inspect and

---

9. (Emphasis sic.)  *Wagster v. Overberg* (C.A.6, 1977), 560 F.2d 735, 740, citing *United States v. Agurs* (1976), 427 U.S. 97, 112–113, 96 S.Ct. 2392, 49 L.Ed.2d 342.

10. *State v. Larkins*, 8th Dist. No. 82325, 2003–Ohio–5928, 2003 WL 22510579, at ¶ 35, citing *Giglio v. United States* (1972), 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104.

copy or photograph books, papers, documents, photographs, tangible objects, et cetera.' So, I mean, I think that takes care of the photographs."

{¶ 24} The record indicates that defense counsel made no attempt to object to Gorsuch's testifying at trial, and it indicates that defense counsel did not object to the admission of her report into evidence. Further, during the oral argument of this case, defense counsel conceded that there was mention of the photographs in the Tri–County Advocacy Center Report, that he timely received a copy of the report during discovery, and that had he diligently pursued the matter of the four photographs, he could have obtained copies of the photographs well in advance of the trial. Defense counsel would have to demonstrate an abuse of discretion on the part of the trial court in admitting the four photographs into evidence and permitting Gorsuch to testify concerning them.[11] Considering that the accuracy and authenticity of the photographs were established by Gorsuch's testimony, and considering that defense counsel could have obtained copies of the photographs in advance of trial once he noticed their existence in the Tri–County Advocacy Center Report, we find no abuse of discretion on the part of the trial court in admitting those photographs.

{¶ 25} During cross-examination of Gorsuch by defense counsel, she was asked to review emergency-room records from Memorial Hospital of Geneva. These records had been obtained by defense counsel and related to an emergency room visit by M.M. on February 3, 2002.

{¶ 26} Gorsuch testified during cross-examination that the emergency-room records reflected that M.M.'s chief complaint, stated with the help of her mother who brought her to the emergency room, was "alleged sexual assault three months ago times two" and that an excerpt of the nurse's notes state, "Per chart, father told her to undress. He then undressed and laid on top of her. She felt him put something inside of her."

{¶ 27} We decline to measure the damning effect of Gorsuch's testimony concerning M.M.'s emergency-room visit, but observe that this testimony was based upon records that defense counsel had obtained during discovery. Therefore, even if defense counsel had taken steps to obtain copies of the four photographs during discovery, steps he could have taken once their existence was disclosed to him, the benefit to his client is questionable in light of the damning nature of the testimony elicited from Gorsuch concerning the emergency-room visit of M.M.

{¶ 28} The second assignment of error is without merit.

{¶ 29} Scheidel's third assignment of error is as follows:

---

11. *State v. Wiles* (1991), 59 Ohio St.3d 71, 78, 571 N.E.2d 97.

{¶ 30} "Appellant was denied a fair trial by reason of improper comments by the prosecuting attorney."

{¶ 31} In this assignment of error, Scheidel points to various comments made by the prosecuting attorney in closing argument. The thrust of his argument here is that the prosecutor was interjecting her personal beliefs or opinions as to the credibility of a witness or as to the guilt of the accused. He cites as examples of prosecutor misconduct the following:

{¶ 32} "[Prosecutor:] And, ladies and gentlemen, in this great land of ours, every guilty man has a right to a trial and, you know what, [Scheidel's] had his trial. This guilty man has had his trial"; and later:

{¶ 33} "[M.M.'s] been telling the truth from the very beginning and she told you the truth when she testified. * * * And ladies and gentlemen, when you're thinking about, do I believe her or not? Ask yourselves. Would I be comfortable leaving my daughter or my granddaughter alone with this defendant for five minutes?"

{¶ 34} These examples from the prosecutor's final argument are merely instances of the prosecutor's trying to secure a conviction. "A prosecutor is encouraged to advocate strongly and even vehemently for a conviction." [12]

{¶ 35} "The test for prosecutorial misconduct is whether the alleged remark was improper and, if so, whether it prejudicially affected the substantial rights of the defendant." [13] Moreover, "it is not improper for a prosecutor to comment upon the evidence in [her] closing argument and to state the appropriate conclusions to be drawn therefrom." [14] Finally, "a prosecutor may comment *fairly* on a witness' credibility based upon his or her in-court testimony." [15] In our judgment, the prosecutor's remarks were not improper and did not deprive Scheidel of a fair trial.

{¶ 36} Scheidel's third assignment of error is without merit.

{¶ 37} The judgment of the trial court is reversed.

{¶ 38} In view of the facts that the prosecutor failed to disclose the existence of M.M.'s statement to defense counsel, which statement could have been used for impeachment as a prior inconsistent statement, that the statement was favorable

---

12. *State v. Wright*, 11th Dist. No.2000–P–0128, 2002 WL 480328, at *7, citing *State v. Draughn* (1992), 76 Ohio App.3d 664, 671, 602 N.E.2d 790.

13. Id., citing *State v. Smith* (2000), 87 Ohio St.3d 424, 442, 721 N.E.2d 93.

14. *State v. Kish*, 11th Dist. No.2001–L–014, 2002–Ohio–7130, 2002 WL 31862661, at ¶ 52.

15. (Emphasis sic.) Id., citing *State v. Keene* (1998), 81 Ohio St.3d 646, 666, 693 N.E.2d 246.

to Scheidel, and that it was material because there is a reasonable probability of a different outcome, we remand this matter for a new trial. This *Brady* violation prevented Scheidel from getting a fair trial. The violation can be rectified only with a new trial.

Judgment reversed
and cause remanded.

O'TOOLE, J., concurs.

RICE, J., dissents.

CYNTHIA WESTCOTT RICE, dissenting.

{¶ 39} While I agree with the majority's conclusion that Deputy Lazanis's police report should have been disclosed, I differ with its position that disclosure of Lazanis's report would have changed the result of the trial. I believe there was no *Brady* violation and accordingly dissent.

{¶ 40} The report in question was taken on February 3, 2002, at 2:50 p.m. In the report, Deputy Lazanis notes that M.M. had disclosed that appellant had assaulted her twice. However, he further indicates M.M. was very quiet during the interview. Lazanis reported that M.M. was afraid of appellant and wished he was "still in jail." Lazanis further observed:

{¶ 41} "From talking with [M.M.], it doesn't sound like penatration [sic] was made, but again she was very afraid and seemed to be bothered by me being male."

{¶ 42} Less than two hours after Lazanis wrote the report, M.M. was taken to the emergency room at Geneva Memorial Hospital. During her visit, the attending emergency room nurse indicated in her report that appellant had instructed M.M. to undress. "[Appellant] then undressed and laid on top of her. [M.M.] felt him put something inside of her." This evidence was elicited during cross-examination by defense counsel in an attempt to impeach Gorsuch, the pediatric nurse practitioner who had performed the sexual-abuse examination on M.M.

{¶ 43} On March 5, 2002, M.M. was examined by Gorsuch. Subsequent to her examination, Gorsuch noted certain vaginal scarring, which she concluded, to a reasonable degree of medical certainty, was consistent with sexual abuse.

{¶ 44} Moreover, James Knight testified that he was visiting appellant in October or November 2001. The men were watching movies when appellant ordered all the children, three boys and M.M., to go to their rooms. Knight testified that appellant eventually left the room to "check on the kids." According to Knight, when the movie ended, appellant had not returned. Knight went

to find appellant to make sure everything was okay. Knight knocked on M.M.'s room door, walked in, and observed "[M.M.] laying on the bed sideways, you know, cross ways across the bed with her clothes off and her hands over her face crying. I found [appellant] standing in front of her with his pants down to his ankles." According to Knight, appellant "slammed the door and told [him] to get the 'F' out of there."

{¶ 45} While not dispositive proof of appellant's guilt on the charges on which he was ultimately convicted, Knight's testimony provides strong corroborative evidence that he committed the crimes for which he was charged.

{¶ 46} In my view, the state should have disclosed Lazanis's report, as it was evidence favorable to the accused and indicative of a prior inconsistent statement of the victim. See *State ex rel. Rasul–Bey v. Onunwor*, 94 Ohio St.3d 119, 121, 2002–Ohio–67, 760 N.E.2d 421 (noting that records such as routine offense and incident reports are always subject to disclosure upon request by a criminal defendant); see, also, *State ex rel. Carpenter v. Tubbs Jones* (1995), 72 Ohio St.3d 579, 580, 651 N.E.2d 993.

{¶ 47} However, Lazanis's report indicates that M.M. was quiet and had exhibited visible discomfort while speaking with him about the incidents due to (1) her fear of appellant and (2) Lazanis's gender. A mere one hour and 25 minutes after Lazanis had written his report, M.M. told an emergency room nurse that appellant, while lying naked on top of her, "put something inside of her." This evidence, in conjunction with Gorsuch's and Knight's testimony, indicates that the evidence as a whole militated heavily in favor of the conviction irrespective of Lazanis's report.

{¶ 48} The majority aptly notes that a *Brady* violation occurs when evidence favorable to the accused is suppressed by the state and there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. For the foregoing reasons, I do not believe that the suppressed report, had it been given to the defense, would have changed the outcome of the trial under review.