OPINION
{¶ 1} Appellant, Terrance A. Ogletree, appeals the judgment entered by the Portage County Court of Common Pleas. Ogletree received a total prison term of thirty-one months for his convictions for dogfighting and cruelty to animals.
 {¶ 2} Ogletree, along with some family members, operated Royal Family Kennels from a residence in Ravenna, Ohio. In November 2004, Sergeant Carrozzi of the Portage County Sheriff's Office executed a search warrant on the residence on an unrelated criminal matter. Once inside the residence, he observed a dog in a crate in the kitchen. This dog had numerous injuries, so Sergeant Carrozzi contacted Beverly Kirkhart, the Portage County Dog Warden.
 {¶ 3} Warden Kirkhart arrived at the residence. She discovered a total of ten adult Pit Bull dogs and eight Pit Bull puppies. The eight puppies were in a single, outdoor kennel. This kennel only had one doghouse in it. Eight of the adult dogs were each in individual kennels behind the house. Each kennel had a doghouse in it. Each dog was chained with a short, heavy chain anchored in the middle of the concrete floor. One dog was outside in a travel crate. Warden Kirkhart noted there was urine in the travel crate and that it appeared a hole had been chewed into the side of the crate. Finally, Warden Kirkhart discovered the dog in the kitchen. This dog had open, oozing wounds.
 {¶ 4} Warden Kirkhart determined that there were safety concerns with allowing the dogs to stay on the premises. Therefore, she contacted members of her staff, who arrived and assisted her in removing all of the dogs.
 {¶ 5} A subsequent search of the residence produced several items linked to dogfighting. Forty-four break sticks were discovered. Break sticks are wooden sticks used to pry a dog's jaw apart after it has bitten something. Several syringes, tubes of antibiotics, scales, and Agricillon, a livestock grade antibiotic, were found in the house.
 {¶ 6} Ogletree was indicted on six counts of dogfighting, in violation of R.C. 959.16(A)(3) or (4), which are fourth-degree felonies. He was also charged with one count of cruelty to animals in violation of R.C. 959.13, a first-degree misdemeanor. The indictment for the cruelty to animals count incorrectly designated the statutory section as R.C. 959.131, which is titled "prohibitions concerning companion animals." At trial, the trial court granted the state's oral motion to amend the indictment to reflect the correct statutory codification for cruelty to animals, R.C. 959.13.
 {¶ 7} Ogletree pled not guilty to these charges. Ogletree filed a motion in limine to exclude "other acts" evidence. Specifically, the motion sought to exclude any testimony from Sergeant Carrozzi concerning the charges brought against Ogletree in a drug possession case. In response to this motion, the trial court ruled that Sergeant Carrozzi could testify that he was at the residence as part of a lawful investigation, but the state could go no further in eliciting evidence as to the other acts.
 {¶ 8} A jury trial was held on June 1, 2005. This trial resulted in a mistrial. A second jury trial commenced the following day. At the close of the state's case-in-chief, Ogletree moved for acquittal on all counts pursuant to Crim.R. 29. The trial court denied his motion. Ogletree presented several witnesses in his defense. Thereafter, he renewed his Crim.R. 29 motion for acquittal. The trial court denied the renewal of the motion. The jury found Ogletree guilty on all seven counts of the indictment.
 {¶ 9} The trial court sentenced Ogletree to a fifteen-month prison term on Count 3 of the indictment, to be served consecutively to a sixteen-month prison term on Count 4 of the indictment. Both of these convictions were for dogfighting. Ogletree received fifteen-month sentences on the remaining four dogfighting convictions, and these sentences were ordered to be served concurrently to the sentences issued for counts three and four. Ogletree received a one hundred eighty-day sentence for the cruelty to animals conviction, which was also ordered to be served concurrently to the sentences on counts three and four. Thus, Ogletree's aggregate prison term for these offenses was thirty-one months. This aggregate prison sentence was ordered to be served consecutively to the prison term Ogletree was serving on another offense.
 {¶ 10} Ogletree raises five assignments of error. His first assignment of error is:
 {¶ 11} "The trial court committed prejudicial and reversible error when it overruled Defendant's Crim.R. 29 motions for acquittal where there was insufficient evidence to support his convictions."
 {¶ 12} A trial court shall grant a motion for acquittal when there is insufficient evidence to sustain a conviction.[1]
When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[2]
 {¶ 13} Ogletree was charged with dogfighting, in violation of R.C. 959.16, which provides, in part:
 {¶ 14} "(A) No person shall do any of the following:
 {¶ 15} "* * *
 {¶ 16} "(3) Sell, purchase, possess, or train, a dog for dogfighting;
 {¶ 17} "(4) Use, train, or possess a dog for seizing, detaining, or maltreating a domestic animal[.]"
 {¶ 18} Initially, Ogletree argues the state did not meet its burden of demonstrating he had possession of the dogs.
 {¶ 19} The state contends a letter signed by James Gibbons, which was introduced at trial, demonstrates that Ogletree owned the dogs. In the letter, Gibbons states he is a co-owner of the seized Pit Bull dogs. Warden Kirkhart testified that, in the letter, Gibbons states that he and Ogletree are the co-owners of the dogs. The letter does not make this assertion. It merely states that Gibbons is the "co-owner of the registered dogs seized from the home of Terrence Ogletree." Since this letter does not state that Ogletree was the other co-owner, this letter had no relevance as to whether Ogletree owned the dogs. Moreover, although it was not objected to, the letter was clearly hearsay. It was an out-of-court statement, offered for the truth of the matter asserted.[3] Thus, we will not consider this letter in our analysis.
 {¶ 20} However, without the letter, the state presented sufficient evidence that Ogletree owned the dogs. Warden Kirkhart testified that Ogletree made the statements "I don't want you to take my dogs" and "I don't want you to hurt my dogs." In both of these statements, Ogletree admits ownership of the dogs.
 {¶ 21} Sergeant Carrozzi testified that Ogletree lived at the residence where the dogs were located. He also testified that Ogletree invited him on to the property.
 {¶ 22} When viewed together and in a light most favorable to the prosecution, these facts constitute sufficient evidence that Ogletree owned the dogs.
 {¶ 23} Next, Ogletree contends that the state did not present sufficient evidence that dogfighting was occurring with the dogs.
 {¶ 24} The state did not present any direct evidence that the dogs were engaged in dogfighting. There were no witnesses to an actual dogfight, nor was there any video evidence of a dogfight. However, the state presented significant circumstantial evidence that the dogs had been engaged in dogfighting. The Supreme Court of Ohio has held that "`circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof.'"[4] Further, the statute does not require direct evidence of an actual dogfight. A violation of the statute occurs if someone possesses or trains a dog for dogfighting.
 {¶ 25} Dr. Waiva Worthley, a licensed veterinarian, testified for the state. Dr. Worthley personally examined six of the dogs that were seized from Ogletree's residence. She noted the individual wounds on each of the dogs and opined as to how old the wounds were, based on the characteristics of the scar tissues. Then, she opined that the wounds were a result of dogfighting.
 {¶ 26} Further, the state seized several items from Ogletree's residence that are consistent with dogfighting, including forty-four break sticks. Warden Kirkhart testified that break sticks are associated with dogfighting. Also, many antibiotics were found in Ogletree's house, including Agricillon, a livestock grade antibiotic. Warden Kirkhart testified that many individuals engaged in dogfighting use this product to treat the dogs after a fight to avoid infection.
 {¶ 27} Finally, Warden Kirkhart testified that there were blood splatters on the kitchen walls. She testified that the nature of the blood splatters and their height from the floor were consistent with dogfighting.
 {¶ 28} The state presented sufficient evidence going to all the elements of dogfighting.
 {¶ 29} Ogletree was also charged with cruelty to animals, in violation of R.C. 959.13, which provides:
 {¶ 30} "(A) No person shall:
 {¶ 31} "(1) Torture an animal, deprive one of necessary sustenance, unnecessarily or cruelly beat, needlessly mutilate or kill, or impound or confine an animal without supplying it during such confinement with a sufficient quantity of good wholesome food and water;
 {¶ 32} "(2) Impound or confine an animal without affording it, during such confinement, access to shelter from wind, snow, or excessive direct sunlight if it can be reasonably expected that the animals would otherwise become sick or in some other way suffer. Division (A)(2) of this section does not apply to animals impounded or confined prior to slaughter. For the purposes of this section, shelter means a man-made enclosure, windbreak, sunshade, or natural windbreak or sunshade that is developed from the earth's contour, tree development, or vegetation."
 {¶ 33} The requisite mental state for the offense of cruelty to animals is recklessness.[5]
 {¶ 34} "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."[6]
 {¶ 35} Warden Kirkhart testified that there were eight Pit Bull puppies in one cage with a single doghouse. She testified that the doghouse was not big enough for all eight puppies to be in at the same time. By implication, this testimony indicates that, at any given time, some of the puppies would be denied adequate shelter from the elements.
 {¶ 36} Additionally, she testified that the concrete outside of the doghouse in the puppies' cage was muddy and covered with feces. While the statute does not explicitly prohibit unsanitary conditions, evidence regarding such conditions can be relevant to demonstrate the lack of the statutorily required necessities.[7] In State v. Davidson, this court held evidence regarding the presence of mud and feces in the dogs' bowls was relevant to the extent it demonstrated that food and water were not put in the dog bowls.[8] In the case sub judice, the presence of mud and feces in the caged area showed that the puppies were confined to the cage for a substantial amount of time. In addition, it showed the puppies could not seek shelter other than the single doghouse, which, according to Warden Kirkhart's testimony, could not accommodate all of the puppies at the same time.
 {¶ 37} Warden Kirkhart testified that one adult dog was found outside in a travel crate. The dog had urinated in the crate. Warden Kirkhart testified that most dogs will not urinate in a crate unless they have been in the crate for a significant time. She also noted that there was no food or water in the crate.
 {¶ 38} Finally, "Missy," the dog found in the crate in the kitchen, had several fresh wounds. Upon finding the dog, Warden Kirkhart noted that she had "many open wounds," which were oozing "blood" and "puss." Dr. Worthley testified that Missy had an extremely swollen head and multiple puncture wounds on her head and face. The Tenth Appellate District has held that there is sufficient evidence to sustain a conviction for cruelty to animals under R.C. 959.13(A)(1) due to an "owner's failure to seek critically necessary veterinary care, if such care represents a reasonable remedy" to the animal's unnecessary suffering.[9] Due to the fact Missy was in a cage in the kitchen infers that Ogletree did not seek timely veterinary care for the dog.
 {¶ 39} The state presented sufficient evidence to support a conviction for cruelty to animals.
 {¶ 40} Ogletree's first assignment of error is without merit.
 {¶ 41} Ogletree's second assignment of error is:
 {¶ 42} "The verdict of the jury in the case sub judice was against the manifest weight of the evidence adduced at trial and contrary to law."
 {¶ 43} In determining whether a verdict is against the manifest weight of the evidence, the Supreme Court of Ohio has adopted the following language as a guide:
 {¶ 44} "`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"[10]
 {¶ 45} The weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide.[11]
 {¶ 46} Several witnesses testified for the defense. These witnesses provided explanations for the injuries the dogs incurred. DeEric Gibbons is Ogletree's nephew and worked for Royal Family Kennels. He testified that the injuries to the dogs "Missy" and "Peebles" occurred on the day Officer Carrozzi arrived at Ogletree's house. DeEric Gibbons testified that Missy and Peebles were involved in an unplanned fight. He also testified that the dog "Monet" was injured while raccoon hunting. However, Justin Conway, another employee of Royal Family Kennels, testified that Monet was injured when she ran off into the woods and got into a fight with an animal.
 {¶ 47} The defense also, through cross-examination of the state's witnesses or by calling its own witnesses, attempted to demonstrate that all of the items seized from Ogletree's residence were just as capable of being used in a dog breeding operation as they were in a dogfighting operation.
 {¶ 48} The defense presented evidence in an attempt to demonstrate that a dogfighting operation was not occurring at Ogletree's residence. It was the jury's duty to weigh this evidence against the evidence presented by the state. Apparently, the jury decided to give more weight to the state's evidence. Upon an independent review of the evidence, we conclude that the jury did not lose its way or create a manifest miscarriage of justice by finding Ogletree guilty on all seven counts.
 {¶ 49} Ogletree's second assignment of error is without merit.
 {¶ 50} Ogletree's third assignment of error is:
 {¶ 51} "The trial court erred to the prejudice of Defendant in denying his motion in limine to exclude the testimony of state witness Sergeant Carrozzi."
 {¶ 52} This court has held that a decision on a motion in limine "rests within the sound discretion of the trial court."[12] The term "abuse of discretion" implies that the court's decision was arbitrary, unreasonable, or unconscionable.[13]
 {¶ 53} The trial court granted Ogletree's motion in limine to the extent it limited Sergeant Carrozzi's testimony to preclude any specific mention of prior bad acts. The trial court explained that Sergeant Carrozzi's testimony was necessary as foundational testimony as to why Warden Kirkhart was contacted about the condition of the dogs. Further, the issue of whether Ogletree lived in the residence was debated at trial. Sergeant Carrozzi's testimony was relevant to this issue. The trial court ordered that the state could not introduce testimony about the nature of the investigation, other charges brought against Ogletree, or the fact that Ogletree was arrested on the day in question.
 {¶ 54} The discussion on the record indicates the trial court fully considered the issue and balanced the interests of the state in presenting its case with the potential prejudice to Ogletree. In the end, the trial court limited the amount of evidence the state could introduce to preclude unnecessary prejudice to Ogletree. The trial court did not abuse its discretion in ruling on Ogletree's motion in limine.
 {¶ 55} Ogletree's third assignment of error is without merit.
 {¶ 56} Ogletree's fourth assignment of error is:
 {¶ 57} "The trial court abused its discretion by failing to grant the defendant's motions for mistrial resulting in unfair prejudice accruing to the defendant."
 {¶ 58} "The determination of whether to grant a mistrial is in the discretion of the trial court."[14] A reviewing court shall not reverse a trial court's decision on a motion for a mistrial unless it determines that the trial court abused its discretion.[15]
 {¶ 59} Ogletree moved for a mistrial following a comment by the assistant prosecutor during opening statement. The assistant prosecutor stated that Sergeant Carrozzi was conducting an investigation. The trial court sustained an objection to the comment, because the state did not refer to the investigation as a "lawful" investigation. However, the trial court denied Ogletree's motion for a mistrial based on this comment.
 {¶ 60} Ogletree also objected to two questions of Sergeant Carrozzi. The first question was:
 {¶ 61} "Q. On or about October to mid November of 2004, were you conducting a lawful investigation pertaining to 4391 Court Street?
 {¶ 62} "* * *
 {¶ 63} "A. Yes."
 {¶ 64} The second question was:
 {¶ 65} "Q. How did you come to that opinion, that the Defendant in this case was in fact the person residing at that address?
 {¶ 66} "A. We had been at the residence on a couple occasions."
 {¶ 67} Despite his assertion to the contrary, the record does not reveal that Ogletree moved for a mistrial in response to these comments. However, defense counsel did object to them. The trial court's rulings in response to Ogletree's objections to the comments made during Sergeant Carrozzi's testimony and the state's opening statement were generally consistent with its ruling on Ogletree's motion in limine. The statements suggested that an investigation was occurring, which was relevant background information to explain why Sergeant Carrozzi was at Ogletree's residence. The trial court sustained the objections and cautioned the state when the comments began to suggest more details of the investigation. However, at no time were the underlying facts of the investigation disclosed to the jury. The trial court did not err in its rulings on these comments and on Ogletree's motion for a mistrial.
 {¶ 68} Finally, we note the trial court declared a mistrial in the first trial following an inappropriate comment by one of the state's witnesses. This fact indicates the trial court was willing to grant a mistrial if it determined one was appropriate.[16]
 {¶ 69} The trial court did not abuse its discretion when it denied Ogletree's motion for mistrial.
 {¶ 70} Ogletree's fourth assignment of error is without merit.
 {¶ 71} Ogletree's fifth assignment of error is:
 {¶ 72} "The trial court committed prejudicial and reversible error where the improper comments of the prosecutor during closing argument so tainted the fairness of the trial and where the limiting instruction given by the court was insufficient to cure the error to the prejudice of the defendant."
 {¶ 73} We note that counsel is to be given latitude during summation.[17] In addition, prosecutorial misconduct will not be a ground for error unless the defendant is denied a fair trial.[18] Also, this court has held that "`it is not improper for a prosecutor to comment upon the evidence in [a] closing argument and to state the appropriate conclusions to be drawn therefrom.'"[19]
 {¶ 74} On appeal, Ogletree contends that nine of the assistant prosecutor's comments during closing argument were improper.
 {¶ 75} Ogletree did not object to six of these comments at trial, thus, he has waived all but plain error.[20] Plain error exists only where the results of the trial would have been different without the error.[21] We have reviewed these comments and conclude that the majority of them are within the parameters of acceptable closing argument. Moreover, we cannot conclude that the results of the trial would have been different without them.
 {¶ 76} We will now address the comments made by the assistant prosecutor that were objected to. These comments are:
 {¶ 77} "[1.] I also suspect that if we're to look at one of your houses or Defense [Attorney's] house, we're not going to find a whole slew of syringes. * * *
 {¶ 78} "[2.] Look at those pictures of syringes when you are back in the Jury room. Look, if you can tell, they are all clean syringes. They haven't been used before. One of those syringes is labeled Children's Motrin. Would you reuse the same syringe over and over for different dogs that you're fighting, that you're using to fight illness and disease. * * *
 {¶ 79} "[3.] Certainly you are not going to find 44 break sticks in your home."
 {¶ 80} The trial court ruled that all of these comments were improper, because the state was asking the members of the jury to put themselves into the defendant's shoes. The trial court sustained defense counsel's objections to these comments. Further, the trial court instructed the jury to disregard the comment about the break sticks. The Supreme Court of Ohio has noted that "[t]he jury is presumed to have followed the court's instructions."[22]
 {¶ 81} Ogletree was not denied a fair trial by the result of these comments. The trial court sustained objections to these comments and issued a curative instruction.
 {¶ 82} Ogletree's fifth assignment of error is without merit.
 {¶ 83} The judgment of the trial court is affirmed.
Ford, P.J., Rice, J., concur.
[1] Crim.R. 29(A).
[2] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979),443 U.S. 307.
[3] See Evid.R. 801(C).
[4] State v. Biros (1997), 78 Ohio St.3d 426, 447, quotingState v. Jenks, 61 Ohio St.3d 259, paragraph one of the syllabus.
[5] (Citations omitted.) State v. Bergen (1997),121 Ohio App.3d 459, 461.
[6] R.C. 2901.22(C).
[7] State v. Davidson, 11th Dist. No. 2005-P-0038,2006-Ohio-1458, at ¶ 34.
[8] Id.
[9] State v. Dresbach (1997), 122 Ohio App.3d 647, 651.
[10] (Citations omitted.) State v. Thompkins (1997),78 Ohio St.3d 380, 387.
[11] State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
[12] State v. Werfel, 11th Dist. Nos. 2002-L-101 2002-L-102,2003-Ohio-6958, at ¶ 64, citing In re Funk, 11th Dist. Nos. 2002-P-0035 2002-P-0036, at ¶ 20.
[13] State v. Adams (1980), 62 Ohio St.2d 151, 157.
[14] State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, at ¶92, citing State v. Glover (1988), 35 Ohio St.3d 18, 19 andState v. Brown, 100 Ohio St.3d 51, 2003-Ohio-5059, at ¶ 42.
[15] Id.
[16] See State v. Ludwick, 11th Dist. No. 2002-A-0024,2004-Ohio-1152, at ¶ 71.
[17] State v. Woodards (1966), 6 Ohio St.2d 14, 26.
[18] State v. Maurer (1984), 15 Ohio St.3d 239, 266.
[19] State v. Scheidel, 165 Ohio App.3d 131, 2006-Ohio-195, at ¶ 35, quoting State v. Kish, 11th Dist. No. 2001-L-014, 2002-Ohio-7130, at ¶ 52.
[20] State v. Green (2000), 90 Ohio St.3d 352, 373, citingState v. Wade (1978), 53 Ohio St.2d 182, paragraph one of the syllabus.
[21] State v. Issa (2001), 93 Ohio St.3d 49, 56, citingState v. Moreland (1990), 50 Ohio St.3d 58, 62.
[22] State v. Jones (2001), 91 Ohio St.3d 335, 344, citingState v. Raglin (1998), 83 Ohio St.3d 253, 264.