OPINION
{¶ 1} Appellant, David E. Feathers, appeals the judgment entered by the Portage County Court of Common Pleas. Feathers was sentenced to an aggregate prison term of 15 years for his convictions for aggravated burglary, felonious assault, and domestic violence.
 {¶ 2} Feathers married Lorrie Dottore in August 2003. The two lived together in a mobile home in Ravenna, which was owned by Dottore prior to the marriage. *Page 2 
 {¶ 3} On July 5, 2004, Dottore was staying in her camper at a local campground. The campground is less than one mile from the mobile home. Feathers worked that day and met Dottore at the camper after work. After sleeping for a short while, Feathers told Dottore that he was tired and did not want to stay the night at the camper but, instead, wanted to return to the mobile home. Dottore testified to the following version of events following Feathers' statement to her. Dottore responded that she did not want to go home and informed Feathers that she wanted a divorce. Feathers pushed Dottore into the camper and onto a couch. He then "smothered" her by lying on top of her and holding his hand over her nose and mouth. When Dottore managed to yell for help, Feathers left the camper.
 {¶ 4} Dottore temporarily stayed in a hotel room. On July 7, 2004, she reported the camper incident to the police. Thereafter, she returned to her mobile home. She discovered that the home had been ransacked, with broken windows, mirrors, and picture frames, and damage to the television, DVD player, and VCR. There was also a significant amount of blood on the carpet.
 {¶ 5} Feathers testified that he argued with Dottore on July 5, 2004. She pushed him out of the camper and he lost his balance. Dottore then left without incident. After Dottore left, Feathers went to his ex-wife's camper and started drinking whiskey. He then took his four-wheel-drive vehicle to a nearby field and "blew off steam." He admitted damaging things at the mobile home, but denied the damage was as severe as Dottore indicated.
 {¶ 6} Following the July 5, 2004 incident, Dottore obtained a temporary protection order ("TPO") against Feathers. Later, she obtained a civil protection order *Page 3 
("CPO"). Also after the July 5th incident, Feathers moved his belongings out of the mobile home, and Dottore had the locks changed.
 {¶ 7} Dottore stated she saw Feathers only two times between the July 5, 2004 incident and the end of October 2004. Once, she saw Feathers at a church in Ravenna, but she did not talk to him. In another incident, she agreed to meet Feathers and his brother at a restaurant. Feathers testified that he saw Dottore several times during this period. In addition to the church and restaurant encounters, he described meeting Dottore at a hotel in Twinsburg, meeting her at the mobile home multiple times, including once when he tiled the bathroom floor.
 {¶ 8} Later in the summer of 2004, Feathers moved to Florida in search of construction work. He had telephone conversations with Dottore during the time he was in Florida. In October 2004, Feathers returned to Ohio to attend his grandmother's funeral.
 {¶ 9} On the evening of October 28, 2004, Dottore was home by herself in the mobile home. She fell asleep on the couch about 3:00 a.m. During the night, Feathers left several voice mail messages for Dottore on her cell phone. Dottore awoke to find Feathers standing over her. Feathers was bleeding. Dottore yelled at Feathers, asked him why he was in the mobile home, and told him to leave. Next, she told Feathers to go to the kitchen, because he was bleeding on the carpet. Feathers found a towel to put on his wounds in an attempt to control the bleeding. Dottore testified that Feathers also pulled a knife out of the kitchen drawer and held it to her throat. He told her he was going to kill her. In an effort to distract Feathers, Dottore told him she would get bandages out of the bathroom and dress his wounds. However, in the bathroom, *Page 4 
Dottore noticed the window was broken, and she decided to climb out of the window. Feathers soon realized Dottore left the mobile home, and he went outside and tackled her to the ground. At this point, a neighbor became aware of the incident and called the police. Feathers left the neighborhood when he saw the neighbor.
 {¶ 10} Feathers testified as follows. Dottore called him when he was on his way to the airport to go back to Florida. He did not fly back to Florida, but did not see Dottore that day. On October 28, 2004, Dottore called him and asked to see him. That day, Feathers' father drove him to the mobile home. He went inside and talked to Dottore. Feathers testified that Dottore was very intoxicated, that she was slurring her words and could not stand up. He also testified that there was a large bottle of rum on the kitchen counter. Feathers informed Dottore that he wanted a divorce. Shortly after Feathers left the mobile home, he had a 19-minute telephone conversation with Dottore. During this conversation, she stated "`[y]ou will be lucky to find me alive after tomorrow morning. And I know a way to do it where nobody will know that I did it.'"
 {¶ 11} Feathers further testified that throughout the night of October 28th and into the morning of the 29th, Feathers called Dottore's cell phone numerous times. He stated he did this because he was concerned that she was going to commit suicide. He went to the mobile home, but parked his vehicle in a secluded area because he was aware of the TPO and was concerned that there was a CPO prohibiting him from being near Dottore. He knocked on the windows and doors of the mobile home, but Dottore did not answer. Feathers was afraid to call the police to check on Dottore because of the TPO. Feathers climbed onto the shed behind the mobile home searching for a spare key. While on the shed, he lost his balance and fell through one of the mobile *Page 5 
home's windows. He sustained several cuts as a result. Dottore woke up and helped Feathers remove his boots and shirt. He went to the kitchen and retrieved a knife to cut his shirt to make a tourniquet. Dottore stated she was going to the bathroom. Feathers became concerned due to her suicidal statements and the fact she recently acquired a gun. When Feathers went to check on Dottore, she was gone. Feathers went outside and confronted Dottore. Dottore informed him that she had obtained a CPO against him. He told her that he was moving back to Florida. She became angry and pushed him down. She then got on top of him and started screaming. Eventually, Feathers stated he was able to run to his vehicle.
 {¶ 12} After Feathers left the area, he drove to a parking lot, where he called his father. His father met him and drove him to a hospital in Cambridge, Ohio, where Feathers was treated for his injuries. At the hospital, Feathers used a fraudulent driver's license bearing his brother's name. Also, he told the hospital personnel that he sustained his injuries from falling onto glass at a nearby barn.
 {¶ 13} On November 4, 2004, in a single indictment, Feathers was charged with one count of aggravated burglary, in violation of "R.C.2911.11(A)(1) and/or (2)(B)," a first-degree felony; one count of felonious assault, in violation of "R.C. 2903.11(A)(1) and/or (2)(B)," a second-degree felony; and one count of domestic violence, in violation of R.C. 2919.25, a fifth-degree felony. The aggravated burglary and felonious assault charges stemmed from the October 29, 2004 incident at the mobile home. The domestic violence charge arose from the July 5, 2004 incident at the camper. The domestic violence count was charged as a felony, because Feathers had a previous *Page 6 
domestic violence conviction against his ex-wife. Feathers pled not guilty to the charges against him.
 {¶ 14} Upon review of the indictment, we note that are several errors that need to be addressed. First, Feathers was charged with violating the "(A)(1) and/or (2)(B)" subsections of R.C. 2903.11 and 2911.11. However, neither of these statutes has a (2)(B) subsection. Section (B) of 2911.11 provides for the degree of the offense for a violation of section (A) of that statute. While R.C. 2903.11 has a subsection (B)(2), it is not relevant to the facts of this case. The indictment is in error for charging violations of "(2)(B)" subsections of these statutes. Further, these errors were compounded, as the trial court's judgment entry also quotes the "(2)(B)" subsections. For the purposes of this appeal, we will proceed as if Feathers was only charged and convicted of the (A)(1) subsections of these statutes.
 {¶ 15} Also, Feathers was charged with domestic violence, in violation of R.C. 2919.25. The indictment charges this offense as a fifth-degree felony due to the allegation that Feathers had a prior domestic violence conviction. Prior to January 8, 2004, a subsequent domestic violence conviction was a fifth-degree felony pursuant to former R.C. 2919.25(D). However, R.C. 2919.25(D) was amended, effective January 8, 2004, which was prior to the date of the alleged commission of the instant offense. Under the revised version, a subsequent conviction for domestic violence is a fourth-degree felony.[1] In its judgment entry, the trial court also referred to Feathers' domestic violence conviction as a fifth-degree felony. *Page 7 
 {¶ 16} We note that we are remanding this matter for a new trial. Upon remand, these errors in the indictment are to be corrected.
 {¶ 17} Feathers filed a motion for relief from prejudicial joinder pursuant to Crim.R. 14. In this motion, Feathers sought to sever the domestic violence charge from the charges related to the October 29, 2004 incident. The trial court did not rule on this motion. A jury trial was held. Following the state's case-in-chief, Feathers moved for acquittal pursuant to Crim.R. 29. The trial court denied Feathers' motion. In addition to calling several defense witnesses, Feathers testified on his own behalf. Following the conclusion of his case, Feathers renewed his Crim.R. 29 motion, which the trial court also denied. The jury found Feathers guilty on all three charges.
 {¶ 18} Feathers was sentenced to a ten-year prison term for his aggravated burglary conviction, a four-year term for his felonious assault conviction, and a one-year term for his domestic violence conviction. These sentences were ordered to be served consecutively, resulting in an aggregate prison term of 15 years.
 {¶ 19} Feathers' initial appellate counsel filed a brief on Feathers' behalf containing fifteen assignments of error. In February 2006, Attorney Michael Partlow was substituted as counsel of record for Feathers. Attorney Partlow has filed a supplemental brief, raising four additional assignments of error. Subsequently, Erik Jones has appeared as Feathers' appellate counsel. Feathers' assigned errors will be addressed out of numerical order. Feathers' first assignment of error is:
 {¶ 20} "The court committed reversible error in not sustaining appellant's objection to the state's cross examination of Robert Corder on prior convictions." *Page 8 
 {¶ 21} Initially, we note that the admission of evidence is left to the sound discretion of the trial court.[2] As such, a decision may not be overturned by a reviewing court absent an abuse of that discretion.[3] "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."[4]
 {¶ 22} Feathers argues the trial court erred by permitting the state to cross-examine one of his witnesses about his prior convictions. Feathers called Robert Corder as a witness. Corder worked with Feathers. In addition, the two knew each other through a local church. Through his role at the church, Corder counseled Feathers about his marital problems. Feathers called Corder to testify that Feathers had previously raised his concerns about Dottore's substance abuse and suicidal thoughts. This testimony would support Feathers' theory that he entered the mobile home on October 29, 2004 to check on Dottore's well being. During direct examination, Corder testified as follows:
 {¶ 23} "Q. Can you, to the best of your recollection, indicate for the Jury, whether you believe, particularly the concerns for suicide were voiced to you?
 {¶ 24} "A. Sure. Well, normally I probably would have a terrible time with the dates, but the one in particular, I happened to be doing some electrical work for one of the county officials here and I was very excited.
 {¶ 25} "He [Feathers] was very depressed when I got his call saying that he felt she [Dottore] was suicidal and that maybe somebody from the church should call her. *Page 9 
 {¶ 26} "But then I knew that I would be meeting him in just a few minutes to give a job bid for electrical work for another county official here."
 {¶ 27} "Q. Who was that county official?
 {¶ 28} "A. Chris Smeiles.
 {¶ 29} "And knowing that, I heard that he was a very good man, I told him that when I got done with the job bid that I would like to also share a problem with him without stating names.
 {¶ 30} "And that particular occasion, he stood there and, you know, said a prayer with me for Dave [Feathers] and his wife and his wife's condition and then the suicide condition.
 {¶ 31} "I happen to have the job bid. I had to go back to find it, because it was accepted and Chris Smeiles had signed it about three or four days after. So I placed it within that week.
 {¶ 32} "Q. When was that?
 {¶ 33} "A. That was June. And my notes I took for the job were on an envelope that was postmarked the 14th of June and the job bid was signed the 30th, so I know it was right in that window. So before the 30th."
 {¶ 34} Upon cross-examination, the state questioned Corder about whether he testified on direct examination that Feathers was a good man. Corder responded that Feathers was a fair man. The state then began to question Corder about Feathers' criminal record. Feathers objected to this line of questioning. The trial court overruled Feathers' objection and permitted the state to cross-examine Corder about Feathers' criminal record. The state asked Corder if he was aware of Feathers' prior convictions, *Page 10 
including: domestic violence; failure to comply; fleeing and eluding the police; vandalism; driving under the influence of alcohol; resisting arrest; driving without an operator's license; and aggravated assault with a motor vehicle.
 {¶ 35} The applicable authority on the admission of evidence of other acts is Evid.R. 404(B), which states:
 {¶ 36} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 37} Evidence of other acts under Evid.R. 404(B) is to be construed against admissibility.[5] This is because "[t]he average individual is prone to much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime."[6]
 {¶ 38} In addition, Evid.R. 404(A) provides, in part:
 {¶ 39} "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:
 {¶ 40} "(1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same is admissible * * * ."
 {¶ 41} The state argues that it was permitted to cross-examine Corder about Feathers' prior convictions because Feathers "opened the door" by presenting favorable *Page 11 
character evidence. The state argues that Corder testified Feathers was "a good man." We disagree.
 {¶ 42} Corder was not referring to Feathers when he made the "good man" comment. He was referring to Chris Smeiles. This is apparent from the following testimony, where Corder states that "he stood there and, you know, said a prayer with me for Dave and his wife and his wife's condition and then the suicide condition." It is clear that "he" does not refer to Feathers, because "Dave" refers to Feathers. The only logical conclusion is that "he" refers to Chris Smeiles.
 {¶ 43} Since Feathers did not "open the door" by introducing positive character evidence, the state was not permitted to impeach Corder with Feathers' criminal record. The trial court abused its discretion by admitting this evidence over objection.
 {¶ 44} Feathers' first assignment of error has merit.
 {¶ 45} Feathers' second assignment of error is:
 {¶ 46} "The state engaged in prosecutorial misconduct in its cross examination of Robert Corder, resulting in reversible error."
 {¶ 47} In our analysis of the first assignment of error, we concluded that the trial court erroneously admitted evidence regarding Feathers' prior bad acts. Thus, consistent with our analysis of Feathers' first assignment of error and to the extent indicated, this assignment of error also has merit.
 {¶ 48} Feathers' second supplemental assignment of error is:
 {¶ 49} "The trial court committed plain error by allowing the testimony of Linda Feathers concerning appellant's character." *Page 12 
 {¶ 50} Linda Feathers is Feathers' ex-wife. Initially, the state called Linda Feathers during its case-in-chief for the purpose of identifying Feathers as the individual referred to in the prior domestic violence conviction. Thereafter, Feathers called Linda Feathers to testify regarding her interactions with Dottore at the campground. On cross-examination, the following colloquy occurred:
 {¶ 51} "Q. Now, [defense counsel] had a witness come in here by the name of Robert Corder that testified that he thought Mr. Feathers was a very good man and told the jury that. You've known him for sixteen years.
 {¶ 52} "A. Uh-huh.
 {¶ 53} "Q. Is he a good man?
 {¶ 54} "A. At times he can be.
 {¶ 55} "There is a dark side.
 {¶ 56} "Q. Tell us about that.
 {¶ 57} "A. Where do you want me to begin?
 {¶ 58} "I want to say his alcoholism is a big problem with it. That's when it really, really comes out. Just very dark.
 {¶ 59} "Q. Can he be violent?
 {¶ 60} "A. Yes.
 {¶ 61} "Q. Were you in fear of him?
 {¶ 62} "A. Yes."
 {¶ 63} Feathers did not object to this testimony. Normally, the failure to object to alleged errors waives the defendant's ability to challenge that issue on appeal, absent *Page 13 
plain error.[7] Plain error exists only where the results of the trial would have been different without the error.[8] However, in Feathers' third supplemental assignment of error, Feathers claims his trial counsel was ineffective for failing to object to this testimony. Therefore, we will address this assignment of error on the regular standard of review, as if there was a proper objection.
 {¶ 64} Again, Feathers did not attempt to elicit positive character evidence from Corder. Corder's testimony that he had heard that "he" was a good man referred to Chris Smeiles, not Feathers. Thus, since Feathers had not "opened the door," the state was not permitted to attack Feathers' character through the testimony of Linda Feathers.
 {¶ 65} Feathers' second supplemental assignment of error has merit.
 {¶ 66} Feathers' first supplemental assignment of error is:
 {¶ 67} "The trial court committed plain error by allowing testimony of Linda Feathers concerning the facts surrounding appellant's prior conviction for domestic violence, beyond identification testimony."
 {¶ 68} Feathers' trial counsel questioned Linda Feathers about Dottore. In addition, he asked Linda Feathers whether her boyfriend, who was involved in the prior domestic violence incident with Feathers, believed Feathers should go to prison. The following is what occurred during this questioning: *Page 14 
 {¶ 69} "Q. Now, related to the case you testified about yesterday, is it true that in that case you had a boyfriend or somebody you were seeing that was a part of the incident.
 {¶ 70} "A. In my case with him?
 {¶ 71} "Q. Yes.
 {¶ 72} "A. Yes.
 {¶ 73} "Q. Is it true that at that time that it wasn't his desire that Mr. Feathers be put in prison.?
 {¶ 74} "A. He thought that he needed help other than prison, his opinion."
 {¶ 75} On cross-examination, the state questioned Linda Feathers about the details of Feathers' prior domestic violence conviction. She testified that Feathers tackled a male companion, who was sitting on her patio with her. She stated that Feathers and the other man engaged in a violent fight, with Feathers choking the man and poking his eyes. She testified that she sprayed Feathers with mace, but it did not have any effect. Linda Feathers stated that Feathers entered her apartment and swung a wrought iron plant stand at her, missing her head but hitting her in the back. Eventually, she testified that Feathers left in a car, which may not have been his, then "went on the freeway and then turned around and went the opposite way for miles and miles." Finally, she testified that Feathers "was traveling north in the southbound lane with the Police after him." *Page 15 
 {¶ 76} Feathers did not object to this testimony. However, in Feathers' third supplemental assignment of error, Feathers claims his trial counsel was ineffective for failing to object to this testimony. Therefore, we will address this assignment of error on the regular standard of review, as if there was a proper objection.
 {¶ 77} Feathers was charged with felony domestic violence, in violation of R.C. 2919.25. An element of the felony version of domestic violence is that the defendant had a prior domestic violence conviction.[9] Proof of the prior conviction is generally accomplished by introducing a certified copy of the judgment entry and adequate testimony to establish that the defendant named in the entry is the defendant in the present case.[10] However, testimony regarding the specific details of the prior domestic violence conviction exceed the necessary evidence to prove the existence of the prior conviction and transform the matter into an Evid.R. 404(B) situation.[11]
 {¶ 78} In this matter, the state met its burden on this element during the direct examination of Linda Feathers, which occurred in its case-in-chief. However, Linda Feathers' subsequent testimony regarding the details of the Feathers' first domestic violence conviction was inadmissible pursuant to Evid.R. 404(B). This testimony was not offered to show lack of accident or mistake, motive, opportunity, intent, preparation, plan, knowledge, or identity. Rather, it was offered to show that Feathers acted in conformity with his prior actions, in direct violation of Evid.R. 404(B). *Page 16 
 {¶ 79} Moreover, this testimony was highly prejudicial for several reasons. First, it suggests that Feathers is uncontrollable, in that he has no reaction to being sprayed with mace. It also reveals details about swinging a large metal object, which could be considered more serious than a common domestic violence situation. Perhaps most troubling is Linda Feathers' speculative and hearsay testimony. Her testimony suggests Feathers "may have" stolen a car following the incident. Also, she testified that Feathers was going the wrong way on the freeway while eluding the police. She did not testify that she was present during the alleged police chase; therefore, her testimony was based entirely on hearsay, as she did not witness Feathers' alleged improper driving.
 {¶ 80} The trial court abused its discretion by allowing this testimony.
 {¶ 81} Feathers' first supplemental assignment of error has merit.
 {¶ 82} Feathers' third supplemental assignment of error is:
 {¶ 83} "The appellant received ineffective assistance of counsel in violation of his rights pursuant to the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution."
 {¶ 84} In this assignment of error, Feathers claims his trial counsel was ineffective for failing to object to the testimony elicited from Linda Feathers that was at issue in his first and second supplemental assignments of error.
 {¶ 85} In State v. Bradley, the Supreme Court of Ohio adopted the following test to determine if counsel's performance is ineffective: "[counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice *Page 17 
arises from counsel's performance."[12] Moreover, "`a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, * * * that course should be followed.'"[13]
 {¶ 86} Feathers' trial counsel should have objected to the inadmissible testimony from Linda Feathers at issue in Feathers' first and second supplemental assignments of error. As noted in our analysis of those assignments of error, this testimony was inadmissible and highly prejudicial to Feathers. Moreover, Feathers was prejudiced by this failure, in that these errors would normally have been waived on appeal except for a showing of plain error. Feathers' third supplemental assignment of error has merit.
 {¶ 87} Since we have found merit in this assignment of error, we addressed Feathers' first and second assignments of error on their merits.
 {¶ 88} Feathers' third assignment of error is:
 {¶ 89} "It was error for the state to cross examine the defendant on prior convictions."
 {¶ 90} Feathers claims it was erroneous for the state to cross-examine him regarding his prior criminal convictions. The state's first question to Feathers on cross-examination was:
 {¶ 91} "Q. Mr. Feathers, you have quite a few conviction[s]; do you not?" *Page 18 
 {¶ 92} Following this question, the state questioned Feathers regarding several of his prior criminal convictions.
 {¶ 93} We note that Feathers did not object to this questioning. Normally, this failure would waive all but plain error.[14] However, by the point in the trial in which Feathers was questioned about his criminal history, the jury was tainted by having already heard the multiple, inadmissible references to Feathers' criminal history. The state specifically and individually asked Corder about all of Feathers' prior convictions. Further, Linda Feathers testified regarding the details of Feathers' prior domestic violence conviction, as well as those details concerning some of the crimes that resulted from Feathers' fleeing after the underlying incident. Thus, by the time Feathers testified, trial counsel could have made a legitimate tactical decision to allow the questioning about Feathers' prior convictions in order to allow Feathers a chance to explain any mitigating circumstances surrounding the prior convictions. Accordingly, we will not hold Feathers to the higher standard of plain error in our analysis of this issue.
 {¶ 94} Evid.R. 609 provides:
 {¶ 95} "For the purpose of attacking the credibility of a witness:
 {¶ 96} "(1) * * *
 {¶ 97} "(2) notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of *Page 19 
the evidence outweighs the danger of unfair prejudice, confusion of the issues, or of misleading the jury."
 {¶ 98} Initially, we note the state not only asked general questions regarding the existence of Feathers' prior convictions, it questioned Feathers about the details of these prior convictions. In this matter, the danger of unfair prejudice and confusion of the issues was high. After reviewing the transcript on this issue, it is clear the state was attempting to demonstrate that Feathers acted in conformity with his prior bad acts. On several occasions, the state questioned Feathers about events pertaining to the instant offenses and followed up with a question essentially asking "just like you did in the last instance," while revealing details of the events surrounding Feathers' prior domestic violence conviction.
 {¶ 99} The state's questioning far exceeded the scope of Evid.R. 609, which permits evidence of certain criminal convictions to impeach the witness.
 {¶ 100} The trial court abused its discretion by admitting this testimony.
 {¶ 101} Feathers' third assignment of error has merit.
 {¶ 102} Feathers' fourth assignment of error is:
 {¶ 103} "The state engaged in prosecutorial misconduct in its closing argument."
 {¶ 104} We note that counsel is to be given latitude during summation.[15]
In addition, prosecutorial misconduct will not be a ground for error unless the defendant is denied a fair trial.[16] Also, this court has held that "`it is not improper for a prosecutor *Page 20 
to comment upon the evidence in [a] closing argument and to state the appropriate conclusions to be drawn therefrom.'"[17]
 {¶ 105} The assistant prosecutor made the following remarks during the state's closing argument:
 {¶ 106} "Regarding the July 5 incident, [Dottore] came in here and testified that her and [Feathers] had an argument. You heard [Feathers'] history. He's admitted that he's had a long criminal history.
 {¶ 107} "His wife came in here — his ex-wife came in here, Linda Feathers, and testified that the same thing had happened to her, that he has a dark side. He could be violent. And you have [Dottore] that came in here and testified that they got into an argument and he tried to smother her."
 {¶ 108}
 {¶ 109} "But, number one, judging his credibility, if you look at his record, he's done this sort of thing with his former wife, Linda Feathers.
 {¶ 110} "[defense counsel]: object.
 {¶ 111} "[assistant prosecutor]: He admitted on the stand that he has a lengthy criminal history."
 {¶ 112} While credibility was an issue, the prosecutor exceeded the latitude allowed in closing arguments. Similar to the reasons we cited in our analysis of Feathers' other assigned errors, the state tried to show that Feathers acted in conformity with his prior bad acts. If applicable, the rationale of Evid.R. 609 is that an individual with a prior felony conviction is less likely to tell the truth in general. In this *Page 21 
matter, the assistant prosecutor was telling the jury, "you should not believe Feathers, because he has committed a similar crime in the past, thus, it is more likely that he committed the instant crimes as well."
 {¶ 113} The state's comments during summation compounded the evidentiary errors committed during the trial. The jury was continuously told of Feathers' bad acts, and that it was permitted to consider his prior bad acts to determine whether he acted in a similar manner during the alleged events Feathers was standing trial for.
 {¶ 114} Feathers' fourth assignment of error has merit.
 {¶ 115} Feathers' fifth assignment of error is:
 {¶ 116} "The cumulative effect of the prosecutor's misconduct deprived the defendant of his right to a fair trial under the Sixth andFourteenth Amendments to the United States Constitution."
 {¶ 117} In our analysis of Feathers' second and fourth assignments of error, we concluded that prosecutorial misconduct occurred. These errors, combined with the other errors, necessitate a reversal in this matter. Therefore, it is not necessary to address this assigned error on its merits.[18]
 {¶ 118} Feathers' fifth assignment of error is moot.
 {¶ 119} Feathers' sixth assignment of error is:
 {¶ 120} "The trial court committed judicial misconduct in his comments to the jury, causing reversible error." *Page 22 
 {¶ 121} Defense counsel was questioning Feathers about certain times he had contact with Dottore between July 5, 2004 and October 29, 2004. This information was relevant, in that if Feathers could show significant contact with Dottore during this time, he may be able to demonstrate he had permission to enter the mobile home in October 2004 and, thus, defeat the trespassing element of the aggravated burglary charge. Feathers briefly testified about two incidents where he saw Dottore, once in a restaurant and once in church. Dottore also testified about these events. Defense counsel then asked Feathers which portions of Dottore's testimony regarding these incidents were inaccurate. The state objected to this questioning, and the trial court sustained the objection, stating:
 {¶ 122} "I'm going to sustain the objection.
 {¶ 123} "I can see us going into a whole pattern of places along the line where he says she lied. We went through that once."
 {¶ 124} While Feathers argues the trial court should have allowed this testimony, his primary argument is that the trial court committed judicial misconduct by its comments. Feathers contends the trial court was telling the jury it did not believe Feathers' testimony. *Page 23 
 {¶ 125} "A claim of judicial misconduct can be sustained only where compelling evidence rebuts the presumption of a judge's disinterestedness."[19] In this matter, we cannot say the trial court's response constitutes compelling evidence that the trial court was not impartial. Nor can we conclude that the trial court was offering an opinion on the credibility of Feathers' testimony. The trial court merely explained its decision for sustaining the state's objection and limiting Feathers' testimony on this issue.
 {¶ 126} Feathers has not demonstrated a valid claim of judicial misconduct.
 {¶ 127} Feathers' sixth assignment of error is without merit.
 {¶ 128} Feathers' seventh assignment of error is:
 {¶ 129} "The court erred in refusing to sever the domestic violence charge from the aggravated burglary and felonious assault charges."
 {¶ 130} Pursuant to Crim.R 8(A), "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character[.]" Joinder of offenses is generally liberally permitted in order to conserve judicial resources, prevent incongruous results in successive trials, or to diminish inconvenience to witnesses.[20] *Page 24 
 {¶ 131} However, pursuant to Crim.R. 14, it may be necessary to require separate trials to prevent prejudice. Crim.R. 14 reads, in pertinent part:
 {¶ 132} "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. In ruling on a motion by a defendant for severance, the court shall order the prosecuting attorney to deliver to the court for inspection pursuant to Rule 16(A)(1)(a) any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial."
 {¶ 133} When a defendant claims that joinder is improper, he must affirmatively show that his rights have been prejudiced.[21] The accused must provide the trial court with sufficient information demonstrating that he would be deprived of the right to a fair trial if joinder is permitted.[22] *Page 25 
 {¶ 134} In this matter, elevated prejudice occurs by trying the crime arising out of the July 5, 2004 incident with the crimes arising out of the October 29, 2004 incident. This is because, for the July incident, Feathers was charged with felony domestic violence, an element of which is a prior domestic violence conviction.[23] Thus, at the trial for the more serious charges, aggravated burglary and felonious assault, the jury would hear evidence that he engaged in domestic violence on two prior occasions (the July incident and the prior incident.) However, Feathers failed to renew his motion for severance at the end of trial. In State v. Owens, the Ninth Appellate District held that "[a] motion for severance due to prejudicial misjoinder under rules of procedure for relief from prejudicial misjoinder must be renewed at the close of the state's case or at the conclusion of all the evidence and unless made at that time, it is waived."[24] This court has continuously adhered to that rationale.[25]
 {¶ 135} Since Feathers failed to renew his motion for severance, he has waived this argument.
 {¶ 136} Feathers' seventh assignment of error is without merit.
 {¶ 137} Feathers' eighth assignment of error is:
 {¶ 138} "The evidence for the conviction for aggravated burglary was insufficient to support a guilty verdict on the charge." *Page 26 
 {¶ 139} A trial court shall grant a motion for acquittal when there is insufficient evidence to sustain a conviction.[26] When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[27]
 {¶ 140} Aggravated burglary is codified in R.C. 2911.11, which provides, in part:
 {¶ 141} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately occupied portion of the structure, any criminal offense, if any of the following apply:
 {¶ 142} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 {¶ 143} "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."
 {¶ 144} Criminal trespass is defined in R.C. 2911.21, and provides, in part:
 {¶ 145} "(A) No person, without privilege to do so, shall do any of the following:
 {¶ 146} "(1) Knowingly enter or remain on the land or premises of another;
 {¶ 147} "* * * *Page 27 
 {¶ 148} "(4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified by signage posted in a conspicuous place or otherwise being notified to do so by the owner or occupant, or the agent or servant of either."
 {¶ 149} Feathers challenges his conviction for aggravated burglary on two bases. First, he contends that the state did not demonstrate he had the requisite intent to commit a felony when he entered into the mobile home. Second, he argues that he could not have trespassed into the mobile home because he was married to Dottore and the mobile home was their joint property.
 {¶ 150} We will first address whether Feathers could have trespassed into the mobile home. "A spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling."[28] In Lilly, the Supreme Court of Ohio held that a person can commit burglary against another even if he or she is the legal owner of the property, provided that another person is in control or custody of the property.[29] The court's rationale was that the burglary statutes were designed to protect the dweller.[30] *Page 28 
 {¶ 151} In this matter, the state presented evidence that Dottore was in exclusive custody and control of the mobile home on October 29, 2004. Dottore testified that Feathers had not lived in the mobile home since July 7, 2004, when his father helped him move his possessions from the residence. She testified that she had obtained a TPO and a CPO preventing Feathers from entering the mobile home. Feathers lived in Florida for several weeks prior to the October 29, 2004 incident. Finally, Dottore testified that she had the locks on the mobile home changed. Thus, the state presented sufficient evidence that Dottore was in possession and control of the mobile home on October 29, 2004.
 {¶ 152} Feathers also argues that the state did not present sufficient evidence that he entered the mobile home with the requisite intent to commit a felony. A person may form the intent to commit a criminal offense at any time during the trespass.[31] As "intent exists only in the mind of the accused, it must be determined from the surrounding facts and circumstances."[32]
 {¶ 153} In this matter, Feathers forced his way into the mobile home. During the night, he had called Dottore's cell phone multiple times. He left threatening voice mail messages for her. After he entered the premises, he held a knife to Dottore's throat and threatened to kill her. Taken together, these events provide sufficient circumstantial evidence that Feathers entered the mobile home to commit a felony offense, i.e., felonious assault. *Page 29 
 {¶ 154} The state presented sufficient evidence for a reasonable person to find all of the elements of aggravated burglary beyond a reasonable doubt. Therefore, the trial court did not err by denying Feathers' motion for acquittal.
 {¶ 155} Feathers' eighth assignment of error is without merit.
 {¶ 156} Feathers' twelfth assignment of error is:
 {¶ 157} "It was improper for the judge to allow the jury to continue deliberations after one juror disclosed that she had heard the Feathers' [sic] were `bad news.'"
 {¶ 158} Feathers claims he was prejudiced by the fact that one of the jurors had heard the Feathers were "bad news" and that this information was relayed to the other members of the jury.
 {¶ 159} During the jury deliberations, one of the jurors remembered an incident from 1984. The juror explained that she was cleaning a house at that time. The owner of the house told her to go across the street to a neighbor if the juror had any problems. The juror asked about the house next door, which belonged to the Feathers family, and the homeowner told her not to go there, that the Feathers were "bad news." The juror did not personally meet any members of the Feathers family. The juror relayed some of this information to the other jurors before bringing it to the court's attention. Further, the juror stated she did not remember this incident until the deliberations. *Page 30 
 {¶ 160} Feathers did not object to the trial court's decision to allow the jury to proceed following the disclosure of this topic. Thus, he has waived all but plain error.[33]
 {¶ 161} "A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion."[34] The term "abuse of discretion" implies that the court's decision was arbitrary, unreasonable, or unconscionable.[35]
 {¶ 162} The trial court questioned the juror about the incident she revealed. The juror stated that she could be fair and impartial and this incident would not have any bearing on her consideration of the case. Likewise, the other jurors stated they could be fair and impartial following the revelation of this incident and that they would not let the incident affect their determination of the case. The trial court was in a position to specifically assess the jurors' credibility and, ultimately, their ability to be impartial.[36]
 {¶ 163} The trial court did not abuse its discretion by allowing the members of the juror to deliberate following the disclosure by the female juror.
 {¶ 164} Feathers' twelfth assignment of error is without merit.
 {¶ 165} Feathers' fourteenth assignment of error is:
 {¶ 166} "Defendant was improperly sentenced on both the aggravated burglary charge and the felonious assault charge where the offenses were allied *Page 31 
offenses of similar import that were not committed separately or with a separate animus as to each."
 {¶ 167} Ohio's statute addressing allied offenses of similar import is R.C. 2941.25, which provides: *Page 32 
 {¶ 168} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 169} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 170} The appropriate test for determining whether certain crimes are allied offenses of similar import is whether "the elements of the crimes "`correspond to such a degree that the commission of one crime will necessarily result in the commission of the other, the crimes are allied offenses of similar import."`"[37] The Supreme Court of Ohio has held that "[u]nder an R.C. 2941.25(A) analysis, the statutorily defined elements of offenses that are claimed to be of similar import are compared in the abstract."[38]
 {¶ 171} The Fifth Appellate District has recently held that "aggravated burglary and felonious assault have different elements and are not allied offenses."[39] We agree. Moreover, this court has held that felonious assault and aggravated burglary *Page 33 
are not allied offenses of similar import.[40] Finally, we note the Second Appellate District has held that burglary and felonious assault are not allied offenses of similar import.[41]
 {¶ 172} Since felonious assault and aggravated burglary are not allied offenses of similar import, the trial court did not err by imposing a separate sentence for each offense.
 {¶ 173} Feathers' fourteenth assignment of error is without merit.
 {¶ 174} Feathers' fifteenth assignment of error is:
 {¶ 175} "Defendant was denied the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments of the United States Constitution."
 {¶ 176} Feathers claims his trial counsel was ineffective for failing to obtain certain cell phone records.
 {¶ 177} An appellate court is limited to the record before it.[42]
In addition, this court has previously held that "[i]f appellant cannot demonstrate the claimed error then we presume the regularity of the trial court proceedings and affirm the judgment."[43]
 {¶ 178} These alleged cell phone records are not in the record. Without the records themselves, we do not know what information would have been contained in those records. Therefore, Feathers cannot demonstrate that he was prejudiced by counsel's failure to obtain the alleged cell phone records. *Page 34 
 {¶ 179} Moreover, Feathers' argument is that these phone records would demonstrate that Dottore called him when he was in Florida. Feathers' trial counsel cross-examined Dottore about whether she called Feathers. She acknowledged that she had called Feathers. Thus, since there was evidence presented that Dottore had called Feathers, Feathers has not demonstrated prejudice on this issue.
 {¶ 180} Feathers' fifteenth assignment of error is without merit.
 {¶ 181} Feathers' ninth, tenth, eleventh, thirteenth, and his fourth supplemental assignment of error are:
 {¶ 182} "[9.] The jury verdict for guilt on the offense of aggravated burglary was against the manifest weight of the evidence.
 {¶ 183} "[10.] The jury's determination that defendant was guilty of felonious assault was against the manifest weight of the evidence.
 {¶ 184} "[11.] The determination that the defendant was guilty of domestic violence was against the manifest weight of the evidence.
 {¶ 185} "[13.] The court improperly imposed consecutive sentences upon the defendant.
 {¶ 186} "[Supplemental 4.] The trial court's imposition of a sentence greater than the minimum term permitted by statute based upon findings not made by a jury nor admitted by appellant is contrary to law and violates appellant's right to a trial by jury and due process, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution." *Page 35 
 {¶ 187} Due to our analysis of Feathers' other assigned errors, this matter is being remanded for a new trial. Thus, these assigned errors are moot.[44]
 {¶ 188} The judgment of the trial court is reversed. This matter is remanded to the trial court for a new trial.
COLLEEN MARY OTOOLE, J., concurs, DIANE V. GRENDELL, J., dissents.
[1] R.C. 2919.25(D).
[2] State v. Kinney (1995), 72 Ohio St.3d 491, 497.
[3] Peters v. Ohio State Lottery Comm. (1992), 63 Ohio St.3d 296,299.
[4] State v. Adams (1980), 62 Ohio St.2d 151, 157.
[5] State v. Lowe (1994), 69 Ohio St.3d 527, 530.
[6] State v. Hector (1969), 19 Ohio St.2d 167, 174-175.
[7] State v. Green (2000), 90 Ohio St.3d 352, 373, citing State v.Wade (1978), 53 Ohio St.2d 182, paragraph one of the syllabus.
[8] State v. Issa (2001), 93 Ohio St.3d 49, 56, citing State v.Moreland (1990), 50 Ohio St.3d 58, 62.
[9] State v. Blonske (1994), 125 Ohio App.3d 103, 109.
[10] Id.
[11] Id. at 110.
[12] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus, adopting the test set forth in Strickland v. Washington
(1984), 466 U.S. 668.
[13] Id. at 143, quoting Strickland, 466 U.S. at 697.
[14] State v. Green, 90 Ohio St.3d at 373, citing State v. Wade,53 Ohio St.2d 182, paragraph one of the syllabus.
[15] State v. Woodards (1966), 6 Ohio St.2d 14, 26.
[16] State v. Maurer (1984), 15 Ohio St.3d 239, 266.
[17] State v. Scheidel, 11th Dist. No. 2003-A-0087, 2006-Ohio-195, at ¶ 35, quoting State v. Kish, 11th Dist. No. 2001-L-014, 2002-Ohio-7130, at ¶ 52.
[18] App.R. 12(A)(1)(c).
[19] State v. Cody, 8th Dist. No. 77427, 2002-Ohio-7055, at ¶ 44, citing In re Disqualification of Olivito (1994), 74 Ohio St.3d 1261,1263.
[20] State v. Torres (1981), 66 Ohio St.2d 340, 343.
[21] See Crim.R. 14; State v. Roberts (1980), 62 Ohio St.2d 170,175
[22] State v. Lott (1990), 51 Ohio St.3d 160, 163.
[23] R.C. 2919.25.
[24] State v. Owens (1975), 51 Ohio App.2d 132, at paragraph two of the syllabus.
[25] State v. Cannon (June 30, 1999), 11th Dist. No. 98-L-032, 1999 Ohio App. LEXIS 3057, at *11-12; State v. Brady (1988),48 Ohio App.3d 41, 44; State v. Daniels (Dec. 23, 1994), 11th Dist. No. 92-T-4730, 1994 Ohio App. LEXIS 5900, at *12-13.
[26] Crim.R. 29(A).
[27] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307.
[28] State v. Lilly (1999), 87 Ohio St.3d 97, paragraph one of the syllabus.
[29] Id. at 102.
[30] Id.
[31] State v. Fontes (2000), 87 Ohio St.3d 527, syllabus.
[32] State v. Blackburn, 11th Dist. No. 2001-T-0052, 2003-Ohio-605, at ¶ 21, citing State v. Flowers (1984), 16 Ohio App.3d 313, 314, overruled on other grounds.
[33] See State v. McKnight, 107 Ohio St.3d 101, 2005-Ohio-6046, at ¶ 185, citing State v. Childs (1968), 14 Ohio St.2d 56, paragraph three of the syllabus.
[34] State v. Williams (1997), 79 Ohio St.3d 1, 8, citing State v.Wilson (1972), 29 Ohio St.2d 203, 211.
[35] State v. Adams (1980), 62 Ohio St.2d 151, 157-158.
[36] See State v. Murphy (2001), 91 Ohio St.3d 516, 526.
[37] (Citations omitted.) State v. Rance (1999), 85 Ohio St.3d 632,636.
[38] (Emphasis in original.) Id., at paragraph one of the syllabus.
[39] State v. Johnson, 5th Dist. No. 06CAA070050, 2006-Ohio-4994, at ¶ 11, citing State v. Jackson (1985), 21 Ohio App.3d 157 and State v.Khateeb (Apr. 19, 1984), 8th Dist. No. 47148, 1984 WL 5512.
[40] See State v. Taylor, 11th Dist. No. 93-A-1812, 1994 Ohio App. LEXIS 5936, at *11.
[41] State v. Clark (1995), 107 Ohio App.3d 141, 148-149.
[42] See, e.g., State v. Ishmail (1978), 54 Ohio St.2d 402, paragraph one of the syllabus.
[43] State v. Davis (Dec. 4, 1998), 11th Dist. No. 97-P-0111, 1998 Ohio App. LEXIS 5810, at *2, citing Rose Chevrolet, Inc. v. Adams
(1988), 36 Ohio St.3d 17, 19; Knapp v. Edwards Laboratories (1980),61 Ohio St.2d 197, 199; Bucary v. Rothrock (July 13, 1990), 11th Dist. No. 89-L-14-046, 1990 Ohio App. LEXIS 2854, at *2-3.
[44] App.R. 12(A)(1)(c). *Page 1